The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 23, 2020

**2020COA109**

**No. 17CA0343, *People v. Abdulla* — Crimes — Unlawful Sexual
Contact**

As a matter of first impression, a division of the court of
appeals considers whether striking a person's intimate parts with
an implement or object, rather than with a part of the actor's own
body, can constitute "touching" under Colorado's unlawful sexual
contact statute, § 18-3-401(4)(a), C.R.S. 2019.  The division
concludes that it can.  Because record evidence would support the
conclusion that the defendant whipped the victim with a belt on her
buttocks for the purpose of sexual arousal, gratification, or abuse,
the division concludes that the trial court did not err by instructing
the jury on unlawful sexual contact as a lesser included offense of
sexual assault.

The division also rejects the defendant's contention that the jury instructions failed to ensure that the jury's verdict was unanimous as to the act underlying the unlawful sexual contact conviction. The division further concludes that any error by the trial court in admitting various hearsay statements was harmless. Accordingly, the division affirms the judgment of conviction.

Court of Appeals No. 17CA0343
City and County of Denver District Court No. 16CR606
Honorable Sheila Ann Rappaport, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sharif Mubarak Abdulla,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE BROWN
J. Jones and Harris, JJ., concur

Announced July 23, 2020

Philip J. Weiser, Attorney General, Grant R. Fevurly, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Alan Kratz, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     A jury found defendant, Sharif Mubarak Abdulla, guilty of unlawful sexual contact and third degree assault. On appeal, he contends that his conviction for unlawful sexual contact must be reversed for three reasons: (1) the trial court erred by granting the prosecution's request to instruct the jury on the lesser included offense of unlawful sexual contact; (2) the jury instructions failed to ensure that the jury's verdict was unanimous as to the act underlying the unlawful sexual contact conviction; and (3) the trial court erred by admitting various hearsay statements.

¶ 2     Resolving the first issue requires us to determine, as a matter of first impression, whether striking a person's intimate parts with an implement or object, rather than with a part of the actor's own body, can constitute "touching" under Colorado's unlawful sexual contact statute, § 18-3-401(4)(a), C.R.S. 2019. We conclude that it can. Because record evidence would support the conclusion that Abdulla whipped the victim with a belt on her buttocks for the purpose of sexual arousal, gratification, or abuse, we conclude that the trial court did not err by instructing the jury on unlawful sexual contact as a lesser included offense of sexual assault.

¶ 3     We also reject the defendant's contention that the jury instructions failed to ensure that the jury's verdict was unanimous as to the act underlying the unlawful sexual contact conviction. And we conclude that, if the trial court erred by admitting various hearsay statements, such error was harmless. Accordingly, we affirm the judgment of conviction.

## I.     Background

¶ 4     On Sunday, January 24, 2016, the victim, L.C., went to a police station to report that her husband, Abdulla, had beaten and raped her the previous night. That same day, L.C. consented to a sexual assault examination at a hospital.

¶ 5     Five days later, the People charged Abdulla with one count of sexual assault, a class 3 felony, and one count of third degree assault, a class 1 misdemeanor. Abdulla pleaded not guilty.

¶ 6     At trial, L.C. testified that she and Abdulla had gotten into an argument that had turned physical. L.C. said it started with Abdulla pushing her multiple times on her arm while telling her to call the police if she wanted him out. Abdulla then forced her to take off her clothes so he could beat her with a belt, forced her to get on her knees so he could put his "dick in [her] mouth," and

forced her to choose between "oral sex or regular sex."  L.C. testified that she didn't want to have either, but, because she was scared, said, "regular sex."  After having sex with L.C., Abdulla went to sleep.

¶ 7     According to L.C., at some point Abdulla woke up and wanted to have sex again.  L.C. said that, because she was still scared, she laid there while he had sex with her.  L.C. testified that she never said "no" to any of the sexual acts and instead pretended to go along with it.

¶ 8     As his theory of defense, Abdulla acknowledged that the "fight became physical" but argued that all the subsequent sexual acts were consensual.

¶ 9     The jury acquitted Abdulla of sexual assault but convicted him of unlawful sexual contact and third degree assault.  The trial court sentenced Abdulla to an indeterminate term of six years to life in the custody of the Department of Corrections on the unlawful sexual contact count and to a concurrent two-year jail term on the misdemeanor assault count.

## II.  Analysis

### A.  The Lesser Included Offense Instruction

¶ 10    At the prosecutor's request, and over Abdulla's counsel's objection, the trial court instructed the jury on unlawful sexual contact as a lesser included offense of sexual assault.  Abdulla asks us to reverse his conviction for unlawful sexual contact because there was no rational basis for that charge to have been submitted to the jury.  We disagree.

### 1.  Standard of Review

¶ 11    We review de novo whether the trial court applied the correct legal standard when it evaluated the prosecutor's request for the lesser included offense instruction.  *People v. Alaniz*, 2016 COA 101, ¶ 40.  But we review for an abuse of discretion the court's determination that there was sufficient evidence to support the instruction.  *People v. Jimenez*, 217 P.3d 841, 870 (Colo. App. 2008); *see also People v. Leyba*, 2019 COA 144, ¶ 44 (*cert. granted in part* May 26, 2020).

### 2.  Applicable Law

¶ 12    A defendant may be convicted of a lesser offense that is "necessarily included in the offense charged."  Crim. P. 31(c); *see*

*also* § 18-1-408(5), C.R.S. 2019; *People v. Cooke*, 186 Colo. 44, 46, 525 P.2d 426, 428 (1974). A lesser offense is "included in an offense charged" if it "is established by proof of the same or less than all the facts required to establish the commission of the offense charged" or if it "differs from the offense charged only in the respect that a less serious injury or risk of injury . . . or a lesser kind of culpability suffices to establish its commission." § 18-1-408(5)(a), (c).

¶ 13 Section 18-1-408(6) "obligate[s]" a trial court to "charge the jury with respect to an included offense" when the party requesting the instruction demonstrates "a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *See also People v. Arispe*, 191 Colo. 555, 557, 555 P.2d 525, 527 (1976); *People v. Skinner*, 825 P.2d 1045, 1046 (Colo. App. 1991). Such a rational basis exists when "there is some evidence, however slight, tending to establish the lesser included offense." *People v. Shaw*, 646 P.2d 375, 379 (Colo. 1982); *accord People v. Annan*, 665 P.2d 629, 630 (Colo. App. 1983).

### 3. The Trial Court Properly Instructed the Jury on the Lesser Included Offense of Unlawful Sexual Contact

#### a. Notice and the *Cooke* Test

¶ 14 Because the prosecutor requested the lesser included instruction, and the trial court granted the request over Abdulla's counsel's objection, the People argue that the test employed in *Cooke*, 186 Colo. at 48, 525 P.2d at 428-29, governs. That test, which is "[m]indful of the primacy of notice within the constitutional guarantee of due process of law and of the duty of the courts to safeguard this right," is satisfied if the lesser included offense is "(1) easily ascertainable from the charging instrument, and (2) not so remote in degree from the offense charged that the prosecution's request appears to be an attempt to salvage a conviction from a case which has proven to be weak." *Id.*

¶ 15 On appeal, Abdulla does not argue that the *Cooke* test was not satisfied or otherwise contend that he was not given enough notice "to give him a fair and adequate opportunity to prepare his defense, and to ensure that he is not taken by surprise because of evidence offered at the time of trial." *Id.* at 46, 525 P.2d at 428. Instead, Abdulla argues that there is an "additional requirement that there

must also be a rational basis for the jury to acquit of the greater offense and convict of the lesser." On this point, we agree.

¶ 16 Satisfaction of the *Cooke* test does not end the inquiry when the defendant's objection to the requested lesser included offense instruction is not based on lack of notice but rather on insufficient evidence. In other words, even if the requested instruction satisfies the *Cooke* test, the trial court must still determine that there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the lesser included offense. *See* § 18-1-408(6); *Arispe*, 191 Colo. at 557, 555 P.2d at 527; *Skinner*, 825 P.2d at 1046.

¶ 17 But we also conclude that the trial court applied the correct legal standard. It is undisputed that unlawful sexual contact is a lesser included offense of sexual assault. *See Page v. People*, 2017 CO 88, ¶ 19. And when the court overruled Abdulla's counsel's objection to the instruction, it said, "[T]he prosecution can request a lesser-included offense if it's not to salvage a verdict, *but if the evidence supports it.*" (Emphasis added.) So we turn to Abdulla's contention that there was no rational basis for the jury to acquit him of sexual assault but to convict him of unlawful sexual contact.

### b.    Rational Basis for the Lesser Included Offense Instruction

¶ 18    As relevant in this case, a person commits sexual assault by means of penetration when he "knowingly inflicts . . . sexual penetration on a victim" and "causes submission of the victim by means of sufficient consequence reasonably calculated to cause submission against the victim's will." § 18-3-402(1)(a), C.R.S. 2019. Sexual assault is a class 3 felony if the person "causes submission of the victim through the actual application of physical force or physical violence." § 18-3-402(4)(a).  Sexual penetration means "sexual intercourse, cunnilingus, fellatio, anilingus, or anal intercourse." § 18-3-401(6).

¶ 19    A person commits unlawful sexual contact if he knowingly subjects the other person to any sexual contact, knowing that the other person does not consent.  § 18-3-404(1)(a), C.R.S. 2019.  The offense is a class 4 felony if, as relevant here, the actor compels the victim to submit "through the actual application of physical force or physical violence." § 18-3-402(4)(a); *see* § 18-3-404(2)(b) ("[U]nlawful sexual contact is a class 4 felony if the actor compels the victim to submit by use of such force . . . as specified in section 18-3-402(4)(a).").  Sexual contact includes "[t]he knowing touching

8

of the victim's intimate parts by the actor . . . if that sexual contact is for the purposes of sexual arousal, gratification, or abuse." § 18-3-401(4)(a). Intimate parts are "the external genitalia or the perineum or the anus or the buttocks or the pubes or the breast of any person." § 18-3-401(2).

¶ 20    First, Abdulla contends that the only evidence of sexual contact not involving penetration — striking L.C.'s buttocks with a belt — is not "sexual contact" as a matter of law. He argues that using a belt to strike a victim's buttocks is not "touching" the victim's buttocks because the belt does not allow the actor to "perceive or experience through the tactile senses." *See People v. Pifer*, 2014 COA 93, ¶ 11. We do not agree.

¶ 21    Abdulla's argument requires us to determine whether his conduct falls within the statutory definition of "sexual contact." Statutory interpretation is a question of law we review de novo. *People v. Vinson*, 42 P.3d 86, 87 (Colo. App. 2002). In interpreting a statute, we aim to ascertain and give effect to the intent of the General Assembly based on the plain and ordinary meaning of the statutory language. *Pifer*, ¶ 10. "We presume that the General Assembly intends a just and reasonable result when it enacts a

statute, and we will not follow a statutory construction that defeats the legislative intent or leads to an unreasonable or absurd result." *Vinson*, 42 P.3d at 87.

¶ 22    The legislature has not defined the word "touching." *See* § 18-3-401. When a criminal statute does not define a term, we can look to the dictionary definition to discern its meaning. *See People v. Janousek*, 871 P.2d 1189, 1196 (Colo. 1994). Indeed, prior divisions of this court have relied on dictionary definitions of the term "touch" to determine whether a particular act constituted "touching" within the meaning of section 18-3-401(4). *See Pifer*, ¶ 11; *Vinson*, 42 P.3d at 87.

¶ 23    Abdulla relies on *Pifer*, where a division of this court was tasked with determining whether the defendant subjected the victim to unlawful sexual contact by touching the victim's intimate parts over her clothes and a sheet. *Pifer*, ¶ 9. The defendant argued that because the sheet was between his hand and the victim's clothing, he did not touch the clothing covering the victim's intimate parts. *Id.*

¶ 24    The division considered a dictionary definition of "touch" as "to perceive or experience through the tactile senses," *id.* at ¶ 11

(quoting Webster's Third New International Dictionary 2415 (2002)), and concluded that the defendant's conduct fell within the plain and ordinary meaning of "touching," *id.* The division flatly rejected the defendant's interpretation because it "would mean that sexual contact could occur only by skin to skin contact, or when the actor's bare skin touches clothing that the victim is wearing." *Id.* at ¶ 12. It continued:

> For instance, when, for the purpose of sexual arousal, abuse, or gratification, the actor wears a condom during a sexual act, touches the victim's bare genitals with a gloved hand, or touches the victim's bare genitals with a bare hand over a blanket, sexual contact would not occur under Pifer's construction. It strikes us as unlikely that the General Assembly intended to draw such distinctions in enacting the sexual assault statute.

*Id.*

¶ 25    Abdulla relies on *Pifer* to argue that the actor must perceive or experience the victim's intimate parts through the tactile senses to constitute "touching." True, the *Pifer* division relied on a dictionary definition of "touch" that included an element of sensory perception, but it did so to address the specific facts of that case and to rebuff defendant's contention that adding a layer of material between his

11

hand and the victim's clothing relieved him of criminal liability. *Id.* at ¶¶ 10-12. We read *Pifer* more broadly — as rejecting a definition of "touch" that requires direct skin-to-skin or skin-to-clothing contact. *Id.* at ¶ 12.

¶ 26    In an earlier case, a division of this court considered whether a defendant ejaculating semen onto the victim's buttocks constituted "touching." *Vinson*, 42 P.3d at 87. The defendant argued that the word "touch" required some part of his body to come into contact with the victim's buttocks. *Id.* The People argued that "touching" need not be "direct person-to-person contact." *Id.*

¶ 27    The division looked to a dictionary definition of the word "touch" as "the act or fact of touching, feeling, striking lightly, or coming in contact." *Id.* (citing Webster's Third New International Dictionary 2416 (1986)). Based on that definition, it rejected the defendant's narrow construction as contrary to the legislative intent. *Id.* It explained,

> [i]f we were to adopt defendant's interpretation, we would have to conclude that using an object to touch another person's intimate parts for the purpose of sexual gratification or arousal does not constitute "sexual contact" under § 18-3-401(4) and, hence, cannot

12

> constitute a sexual assault.  We see no basis for adopting such an interpretation.

*Id.*

¶ 28    Thus, the division concluded that ejaculating semen onto another person's intimate parts (or onto the clothing covering another person's intimate parts) may constitute "touching" for purposes of establishing "sexual contact."  *Id.* at 88.[1]

---

[1] In *People v. Ramirez*, 2018 COA 129, a division of this court considered whether a defendant ejaculating into the hands of the victim constituted unlawful sexual contact.  Because it determined that the victim's hands were not an intimate part (touched by defendant's semen) and that the defendant's semen was not an intimate part (touched by the victim's hands), it found insufficient evidence of sexual contact.  *Id.* at ¶¶ 17-21, 36-41; *see also* § 18-3-401(4)(b)-(c), C.R.S. 2019 (reflecting the legislative response to *Ramirez*).  In so doing, however, the *Ramirez* division expressly "agree[d] with *Vinson*; ejaculating onto the intimate parts of the victim constitutes sexual contact within the meaning of section 18-3-401(4)[(a)]."  *Id.* at ¶ 16.  In *People v. Cook*, 197 P.3d 269, 278 (Colo. App. 2008), a division of this court determined, albeit in the context of whether a child hearsay statement was admissible as a statement "describing any act of sexual contact" under section 13-25-129, C.R.S. 2008, that a defendant's act of intimidating a victim into touching herself for his own sexual gratification could constitute "constructive touching" for purposes of "sexual contact," even in the absence of any physical contact between the defendant and the victim.  Similarly, in *People v. Moore*, 877 P.2d 840, 846-48 (Colo. 1994), the defendant was convicted of sexual assault on a child, although under a complicity theory, even though he did not physically touch the child, but instead forced his wife to complete the act.

13

¶ 29    Like divisions before us, we look to the dictionary definitions of "touch" to guide our analysis.  Although one definition of "touch" is "to bring a bodily part into contact with especially so as to perceive through the tactile sense," which is similar to the definition used by the division in *Pifer*, another common definition is "to strike or push lightly especially with the hand or foot or an implement," which is more like the definition used by the division in *Vinson*.  Merriam-Webster Dictionary, https://perma.cc/TY5P-DJ5N.

¶ 30    Notably, the latter definition contemplates use of "an implement" to accomplish the "touch."  *Id.*  Thus, we conclude that a definition of "touching" that includes use of an implement or object is consistent with the General Assembly's intent as reflected in the plain and ordinary meaning of the statutory language.  Put another way, we believe Abdulla's narrow construction of the term "touching" is contrary to the legislative intent.  *See Vinson*, 42 P.3d at 87.  That is because, if we were to adopt Abdulla's interpretation, we would have to conclude that using an object or implement — such as a belt, whip, or sex toy — to touch another person's intimate parts for the purpose of sexual gratification, arousal, or abuse cannot constitute a sexual assault.  *See id.*  And, like the

14

division in *Vinson*, "[w]e see no basis for adopting such an interpretation." *Id.*; *see also Matter of Winner S.*, 676 N.Y.2d 783, 785 (N.Y. Fam. Ct. 1998) (concluding that the defendant's use of a pencil to touch the victim's vaginal area over the victim's clothing constitutes touching for the purposes of sexual contact as referred to in the applicable statute); *State v. Crosky*, No. 06AP-655, 2008 WL 169346, at *13 (Ohio Ct. App. Jan. 17, 2008) (unpublished opinion) (concluding that the defendant's use of a vibrator to touch the victim's vagina over the victim's clothing constitutes touching for the purposes of sexual contact (citing *State v. Jenkins*, No. 2000-CA-59, 2001 WL 848582, at *5 (Ohio Ct. App. July 27, 2001) (unpublished opinion)).

¶ 31  As a result, if Abdulla whipped L.C. on her buttocks with a belt for the purpose of sexual arousal, gratification, or abuse, the act could constitute "touching of the victim's intimate parts" sufficient to establish sexual contact.  The record evidence supports this conclusion.

¶ 32  L.C. testified that she asked Abdulla to stop beating her with the belt.  When Abdulla stopped hitting her, he sat down on the bed, told L.C. to get down on her knees, and put his erect penis into

15

her mouth. From this evidence, the jury reasonably could have found that Abdulla got aroused from whipping L.C. with the belt, such that his "touching" of L.C.'s intimate parts was "for the purpose[] of sexual arousal." *See* § 18-3-401(4)(a). The jury also could have found that Abdulla knew L.C. did not consent to the beating. Thus, it would have been reasonable for the jury to conclude that Abdulla committed unlawful sexual contact.

¶ 33 Still, even assuming Abdulla is correct that spanking with a belt does not constitute sexual contact as a matter of law, hitting L.C. on her buttocks with the belt was not the only act evidenced by the record that would qualify as sexual contact but not sexual assault. For example, L.C. testified that Abdulla kissed her on various parts of her body, including her breasts and her buttocks. On cross-examination, defense counsel asked L.C., "At some point, he did ask to kiss your wounds? To kiss you where he hit you?" To which L.C. responded, "Yes." And when defense counsel asked L.C., "And he's also kissing parts of your butt as well?" L.C. again answered, "Yes." Accordingly, the jury could have properly found that when Abdulla kissed L.C.'s breasts or buttocks, he committed unlawful sexual contact.

¶ 34    Second, Abdulla essentially argues that L.C.'s consent was an all-or-nothing proposition: L.C. either consented to all the acts or did not consent to any of them.  If the former, Abdulla should be acquitted and, if the latter, he would have been found guilty of sexual assault (because the sexual acts included penetration), not unlawful sexual contact.  Basically, Abdulla argues that the jury either had to believe or reject all of L.C.'s testimony that she did not consent to any of the sexual acts; it could not have found that some of the sexual acts were consensual while others were not.

¶ 35    But neither we nor the trial court are constrained by Abdulla's theory of the case.  *See Brown v. People*, 239 P.3d 764, 767-69 (Colo. 2010) (explaining a party's theory of the case is not determinative of whether a lesser included instruction should be given, but rather the inquiry focuses on whether there "is a rational basis for the instruction in the evidentiary record").  And we conclude there was evidence in the record that could have led the jury to conclude that L.C. consented to certain acts and did not consent to others.

¶ 36    L.C. said the spanking lasted on and off for about fifteen minutes.  When she asked him to stop hitting her with the belt, he

told her to kneel down and he put his erect penis in her mouth. L.C. testified that she never said no to this act. Throughout the series of events, L.C. never told him not to touch her, never tried to push him away, and never tried to squeeze her legs to not give him access. Instead, L.C. admitted that she "kind of pretended to go along with him." Based on this evidence, it would have been reasonable for the jury to conclude that L.C. did not consent to Abdulla whipping her with a belt and then kissing the parts of her body he had just beaten, while at the same time concluding either that L.C. consented to have sex with Abdulla thereafter (crediting Abdulla's affirmative defense of consent) or that L.C. feigned consent well enough that Abdulla did not know the sex was against her will.

¶ 37    As the trial court said, "[The jury has] to agree on one act, whether it be penile, oral, vaginal, whatever. And they could find one was consensual or one wasn't, or any combination thereof." Further, as Abdulla concedes in his opening brief, "[T]he jury could have disagreed as to whether L.C. was credible with respect to different alleged acts of unlawful sexual contact, including whether certain acts were consensual while other acts were not."

18

¶ 38    Thus, we conclude that the trial court applied the correct legal standard and did not abuse its discretion by instructing the jury on the lesser included offense of unlawful sexual contact.

## B.    The Unanimity Instruction

¶ 39    Next, Abdulla argues that even if there was a rational basis for the trial court to have instructed the jury on the lesser included offense, reversal is nonetheless required because of the trial court's failure to ensure juror unanimity as to the underlying act of unlawful sexual contact.

### 1.    Additional Background

¶ 40    The jury received the following relevant instructions:

- Instruction Number 2 told the jury, "Mr. Abdulla is charged with committing the crimes of Sexual Assault and Assault in the Third Degree."

- Instruction Number 3 explained, "[e]ach count charges a separate and distinct offense and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count."

- Instruction Number 4 said, "[i]n order to convict Sharif Abdulla of Sexual Assault, you must either unanimously agree that Mr. Abdulla committed the same act or acts, or that he committed all of the acts alleged." This unanimity instruction was fashioned after the Colorado Model Jury Instructions.

- Instruction Number 11 provided the elements of sexual assault.

- Instruction Number 13 explained, "[t]he offense of Sexual Assault, as charged in the information in this case necessarily includes the lesser offense of Unlawful Sexual Contact." The instruction then gave the elements of unlawful sexual contact.

- Instruction Number 18 was the defense theory of the case instruction. It said, in relevant part, "Mr. Abdulla is charged with two distinct crimes: Sexual Assault and Assault in the Third Degree."

¶ 41    During the jury instruction conference, defense counsel did not request any changes to the unanimity instruction based on the

trial court's decision to instruct the jury on the lesser included offense of unlawful sexual contact.

¶ 42     Both the prosecutor and defense counsel discussed the unanimity instruction in their closing arguments. In doing so, neither told the jury that the unanimity requirement applied only to the sexual assault charge. Instead, both told the jurors that they had to be unanimous when determining what actually happened, as a factual matter, in this case.

¶ 43     For example, when defense counsel explained unanimity to the jury, she did so by expressly referencing Instruction Number 4, but by applying it to the *assault* charge:

> For example, let's say half of you believe that Mr. Abdulla hit his wife but that he didn't use any belt. The other half of you say, you know what, I think he did use a belt. Do you know what the verdict is? Not guilty, because that is not a unanimous verdict. And unanimity is required by law. You can look at Instruction Number 4. That specifically tells you that is the law.

¶ 44     And the prosecutor's explanation of unanimity to the jury was in the context of sexual assault, with a focus on the jury's role as the fact finder:

Defense counsel also talked to you about this idea that you all have to be unanimous. Let's talk about that. When you go back there, you're going to probably start trying to sort out the facts, because you're the trier of facts; you're the ones who determine what happened.

And you may say, okay, everyone seems to be in agreement that there was this - - that he put his penis in her mouth, oral penetration, fellatio; and that was done in between whoopings. That's one. That's guilty.

If you agree on two, because that's what the facts show, that's guilty, you agree on three; you agree on every single time that he sexually penetrated her during and after whooping her, that's guilty. You need to agree, but you only need to agree on one.

¶ 45   During jury deliberations, the jury asked one question: "[w]hat if we are unanimous on one count but can't come to agreement on another?" The question came at about 4:30 p.m. on a Friday afternoon. Without answering the question, the trial court let the jury go home for the weekend. Then, after a few hours of deliberations on Monday morning, the jury returned its verdict.

## 2.    Standard of Review

¶ 46   "Trial courts have a duty to correctly instruct juries on all matters of law." *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011).

22

We review jury instructions de novo to determine "whether the instructions as a whole" correctly informed the jury of the law. *Id.*

¶ 47  As this issue was not preserved, the parties agree we review for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14. A plain error is an error that is both obvious and substantial. *Id.* Under this standard, we will reverse only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)). With respect to jury instructions, the defendant must "demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction." *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001) (quoting *Bogdanov v. People*, 941 P.2d 247, 255-56 (Colo. 1997)).

### 3.  Applicable Law

¶ 48  Section 16-10-108, C.R.S. 2019, requires that "[t]he verdict of the jury shall be unanimous." The trial court must properly instruct the jury to ensure that a conviction on any count is the result of a unanimous verdict. *See People v. Harris*, 2015 COA 53, ¶ 39.

¶ 49     When there is evidence of distinct multiple acts, the prosecution may be compelled to elect the act on which it relies for conviction or, alternatively, the defendant may be entitled to a special unanimity instruction. *Melina v. People,* 161 P.3d 635, 639 (Colo. 2007); *Quintano v. People,* 105 P.3d 585, 593 (Colo. 2005).

> [W]hen the evidence does not present a reasonable likelihood that jurors may disagree on which acts the defendant committed, the prosecution need not designate a particular instance. If the prosecutor decides not to designate a particular instance, the jurors should be instructed that in order to convict the defendant they must either unanimously agree that the defendant committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged.

*Thomas v. People,* 803 P.2d 144, 153-54 (Colo. 1990).

### 4.    We Find No Plain Error in the Jury Instructions

¶ 50     As an initial matter, both at trial and on appeal, the parties disagree regarding whether a unanimity instruction was necessary. The People argue that, because the evidence established one continuing course of conduct, there was no need for a unanimity instruction. *See People v. Davis,* 2017 COA 40M, ¶ 14.

24

¶ 51    If the People are correct that this was only one criminal episode, then it follows that the trial court did not err, much less plainly err, by failing to give an *additional* unanimity instruction on the unlawful sexual contact charge. *Id.* But, at defense counsel's urging, the trial court rejected the People's argument and determined that a unanimity instruction was necessary.

¶ 52    We need not determine whether we could affirm on the alternative basis advocated by the People, however, because we discern no plain error in the instructions given, for two reasons.

¶ 53    First, the trial court gave a unanimity instruction that was agreed upon by the prosecution and the defense, albeit one that specifically referenced sexual assault; this is not a case in which the trial court failed to give a unanimity instruction at all.

¶ 54    Second, the jury was instructed that unlawful sexual contact was a lesser included offense of sexual assault, suggesting that any instruction regarding sexual assault applied equally to unlawful sexual contact. And the jury was instructed that it had to be unanimous regarding the specific act or acts, or as to all the acts, underlying the sexual assault. Accordingly, although the unanimity instruction specifically referenced the offense of sexual assault and

did not reference the offense of unlawful sexual contact, because the jury was nonetheless instructed that unlawful sexual contact was a lesser included offense of sexual assault, the unanimity instruction logically encompassed the lesser included offense.

¶ 55    It certainly would have been better for the unanimity instruction to have stated explicitly that it applied to both the greater and lesser offense.  Still, under these circumstances, the trial court's failure to give a separate, additional unanimity instruction was not erroneous, let alone obviously so.

¶ 56    However, even if the court erred, and that error was obvious, that error does not cast serious doubt on the reliability of the judgment of conviction.  *See Miller,* 113 P.3d at 750.  The record does not establish a reasonable possibility that the instructional error contributed to Abdulla's conviction, *Garcia,* 28 P.3d at 344, because there is no reasonable possibility that the jury misunderstood its obligation to unanimously agree on which act or acts constituted unlawful sexual contact.

¶ 57    As noted above, the sexual assault unanimity instruction logically applied to the lesser included unlawful sexual contact charge.  No one argued that the concept of unanimity was limited to

the sexual assault charge. On the contrary, in closing argument, Abdulla's counsel explained the concept of unanimity to the jury by means of an example involving a physical assault. Accordingly, even though the unanimity instruction did not specifically refer to either unlawful sexual contact or third degree assault, the jury was told it needed to be unanimous as to the specific act or acts that Abdulla committed, even with respect to charges other than sexual assault.

¶ 58 Moreover, we employ the presumption that the jury understands and applies the given instructions unless a contrary showing is made, and there was no indication that the jury did not understand the instructions as a whole or the unanimity instruction in particular. *See Quintano*, 105 P.3d at 594-95 (affirming the defendant's convictions notwithstanding the jury's expressed confusion regarding unanimity because "[a]s a whole, the record demonstrate[d] that the jury understood their tasks and arrived at some means of demarcating the various incidents of sexual contact"). Unlike in *Quintano*, the jury did not ask questions demonstrating confusion about the unanimity instruction. *Id.* at 589. In fact, the only question the jury asked while it was

deliberating indicated it was not unanimous on one of the counts, thus demonstrating its general understanding of the need for a unanimous verdict on every count.

¶ 59    Thus, we discern no plain error in the jury instructions.

### C.    Hearsay

¶ 60    Abdulla argues that the trial court erroneously admitted multiple hearsay statements and that the statements substantially influenced the verdict and affected the fairness of the trial proceedings. Specifically, he challenges the trial court's admission of statements L.C. made to (1) a detective; (2) her sister; and (3) the sexual assault nurse examiner (SANE). We find no reversible error.

### 1.    Standard of Review

¶ 61    We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Tyme*, 2013 COA 59, ¶ 8. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *People v. Dominguez*, 2019 COA 78, ¶ 13.

¶ 62    Because Abdulla's counsel objected to admission of this evidence at trial, we review for harmless error. *People v. Pernell*, 2018 CO 13, ¶ 22. Under this standard, "an erroneous evidentiary

28

ruling does not require reversal unless the ruling affects the accused's substantial rights." *Id.* (quoting *Nicholls v. People*, 2017 CO 71, ¶ 17). This determination necessarily results from "a case specific assessment of the likely impact of the error in question on the outcome of the litigation as a whole." *Id.* (quoting *People v. Rock*, 2017 CO 84, ¶ 22). An error is harmless "if there is no reasonable possibility that it contributed to the defendant's conviction." *Id.*

## 2. Applicable Law

¶ 63 Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). If a statement is hearsay, it is inadmissible unless it falls within an exception. CRE 802. "The burden of establishing the preliminary facts to establish the hearsay exception is on the proponent of the evidence." *People v. Garcia*, 826 P.2d 1259, 1264 (Colo. 1992).

## 3. Excited Utterances

¶ 64 Hearsay may be admitted at trial if it constitutes an excited utterance — a statement relating to a startling event made while the declarant was under the stress of the excitement caused by the

event.  *See* CRE 803(2).  A statement may qualify under the excited utterance exception if

> (1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer; (2) the declarant's statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event.

*People v. King*, 121 P.3d 234, 237-38 (Colo. App. 2005).

¶ 65    Factors to be considered in determining whether the statement was spontaneous include the lapse of time between the startling event and the out-of-court statement, whether the statement was made in response to an inquiry, whether the statement was accompanied by outward signs of excitement or emotional distress, and the choice of words employed by the declarant to describe the experience.  *People v. Compan*, 100 P.3d 533, 536 (Colo. App. 2004), *aff'd*, 121 P.3d 876 (Colo. 2005).  While there is no "bright-line time limitation" for an excited utterance, the statement must be a spontaneous reaction rather than the operation of "normal reflective thought processes."  *People v. Stephenson*, 56 P.3d 1112, 1115-16 (Colo. App. 2001).  The trial court is in the best position to consider

the effect of a startling event on a declarant, and it is afforded wide discretion in determining admissibility under the excited utterance hearsay exception. *People v. Martinez*, 18 P.3d 831, 835 (Colo. App. 2000).

### a. The Detective's Testimony

¶ 66 Abdulla argues that the trial court erred by admitting, as an excited utterance, L.C.'s statements made while she was at the police station at approximately 2 p.m. the day after the alleged incident.

¶ 67 L.C. testified that when she woke up the morning after the assault, she took a shower and went to church with her son. At church, she spoke with her pastor's wife. And after church, she went to the police station with her son.

¶ 68 Detective Derek McCluskie testified at trial regarding L.C.'s initial report at the police station. The detective described L.C.'s demeanor upon arriving at the station as "fearful, visibly upset, crying, and distraught." When the prosecutor asked the detective whether L.C. had "indicate[d] how [he] could help her," Abdulla objected on hearsay grounds.

¶ 69    The trial court overruled the objection, reasoning that L.C.'s statements to the detective fell within the excited utterance exception to hearsay.  In support of its ruling, the trial court made the following record:

- "[T]here is no timeframe specifically for excited utterances."

- Though the timeframe was unclear, it was "certainly some time, some hours after the alleged incident occurred."

- "According to [Detective McCluskie], she was still under the trauma, if you will, excitement, stress of what had occurred to her according to the physical demeanor that has been described to us."

- The detective's description was "consistent with someone who is still seeing or feeling the effects of the trauma."

¶ 70    Detective McCluskie then testified that L.C. reported that "her husband had made her take off her clothing, he whipped her with a belt and made her - - her words - - suck his dick, then had sex with her."  L.C. "didn't tell [Abdulla] to stop for fear of further assault."

¶ 71    On appeal, Abdulla does not argue that the event L.C. described was not "startling" or that L.C. did not have the opportunity to observe it (nor could he, based on the evidence). Instead, he argues that too much time passed between the event and the statements and "that [L.C.] had regained her composure and exercised reflective thought," as evidenced by having gone to church and spoken with the pastor's wife before going to the police station. Under such circumstances, he argues, the statements were not excited utterances.

¶ 72    Abdulla is correct that the passage of time and L.C.'s intervening conduct both cut against the likelihood that the statement to the detective was an excited utterance. We acknowledge that "the excited utterance exception extends to statements made in response to questioning." *King*, 121 P.3d at 238 (citing *People v. Hulsing*, 825 P.2d 1027, 1031 (Colo. App. 1991)). And we acknowledge that there is no bright line rule regarding the passage of time between the startling event and the excited utterance. *Stephenson*, 56 P.3d at 1115-16.

¶ 73    But at least a dozen hours had passed between the event and L.C.'s report to the detective, which is more time than has been

sanctioned by previous reported decisions of this court for adult excited utterances. *Pernell*, ¶¶ 27-35 (holding it was error to admit statements made twelve hours after a sexual assault because the declarant's testimony indicated that she had "several independent interludes of reflective thought" before making the statements (quoting *People v. Pernell*, 2015 COA 157, ¶ 34)); *Stephenson*, 56 P.3d at 1116 (holding it was error to admit statements made three hours after the declarant witnessed a shooting because there were "several independent interludes of reflective thought" that removed the required spontaneity from the declarant's statements). And the trial court's finding that L.C. was "still under the trauma" of the event when she was speaking with the detective would be insufficient by itself to support admitting the challenged statements under CRE 803(2). *See Pernell*, ¶¶ 31, 33. But even if the court erred by admitting the statement as an excited utterance, for the reasons set forth *infra* Part II.C.5, we conclude that any error was harmless.

### b.     The Sister's Testimony

¶ 74     Abdulla also argues that the trial court erred by admitting, under the excited utterance exception to hearsay, statements L.C.

34

made during a phone call with her younger sister the day after the alleged incident.

¶ 75 Although L.C.'s sister testified that L.C. called her before L.C. went to the police station, L.C. testified that she called her sister after she had been at the police station. Her sister testified that when L.C. called, L.C. was "quiet . . . shaky . . . real shaky like she was scared" and that she "could tell that she was crying" and that something was wrong. When the prosecutor asked her, "What did she tell you?" Abdulla's attorney objected on hearsay grounds.

¶ 76 The trial court overruled the objection, reasoning that L.C.'s statements to her sister satisfied the excited utterance exception to the hearsay rule. In support of its ruling, the trial court made the following record:

- The incident occurred on the evening of Saturday, January 23, sometime after 7 p.m.

- The phone call occurred early the next morning.

- "This is her sister, whom she's close to."

- "[L.C.] was crying. She appeared scared. Her - - her voice was different, soft."

- "[S]he was crying as she relayed the information."

- "The important thing about excited utterance, leaving aside the time frame, which is close in time here in terms of the number of hours, but, secondly, the person appears to be still under the stress of the trauma, emotion of the incident that was being discussed at that time."

¶ 77 L.C.'s sister then testified that L.C. told her "that her and her husband had gotten into a fight, and he had beat her with a belt and raped her."

¶ 78 Again, Abdulla does not challenge the nature of the event L.C. reported to her sister or L.C.'s ability to observe it; instead, he argues that the lengthy time lapse between the event and the statement and the evidence that L.C. had regained her composure and reflected cause the statements to fall outside the excited utterance exception to the hearsay rule.

¶ 79 We have the same concerns about the admission of L.C.'s statements to her sister as we do regarding L.C.'s statements to the detective. A significant amount of time had passed between the event and the statement, and it appears that L.C. had several independent interludes of reflective thought during that interval.

But, again, even if the trial court abused its discretion by admitting L.C.'s statement to her sister, for the reasons set forth *infra* Part II.C.5, we conclude that any error was harmless.

4. Statements Made for Medical Treatment or Diagnosis

¶ 80    Hearsay statements may be admitted if they are "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." CRE 803(4). Statements made to a medical professional are presumptively reliable due to the declarant's general belief that providing truthful information to medical professionals will assist in effective diagnosis and treatment. *People v. Galloway*, 726 P.2d 249, 252 (Colo. App. 1986). A statement made to a medical professional during an exam is admissible if (1) the statement is reasonably pertinent to treatment or diagnosis and (2) the content of the statement is such as is reasonably relied on by a physician in treatment or diagnosis. *Tyme,* ¶ 16.

¶ 81     Abdulla contends that the trial court erred by admitting the hearsay testimony of the SANE, who recounted what L.C. told her regarding the alleged sexual assault.

¶ 82     The SANE testified that she first takes a "medical history from [the patient] about what happened, the events of the assault."  The medical history helps her identify injuries and determine whether the patient may need further treatment.  She explained that she writes down what the patient says word for word.  Then she conducts a "head-to-toe-body-surface exam looking for injury" while also "collecting evidence."  When the prosecutor said to the SANE, "So let's talk about what she told you that you took down word for word," Abdulla's counsel objected on hearsay grounds.

¶ 83     The trial court overruled the objection, reasoning that L.C.'s statements to the SANE were admissible pursuant to the medical diagnosis exception.  Citing *Tyme*, the trial court made the following record in support of its ruling:

- There is "ample case law" that "allows SANE testimony for a number of reasons."

- One of the reasons SANE testimony is generally admissible is that "the patient has to consent."

- Another reason is that "a SANE nurse doing an examination collects evidence and statements from the alleged victim in order to determine what to relate to the doctor, what type of treatment is necessary, whether it be physical injuries, internal injuries."

- The information the SANE nurse collects is for purposes of medical diagnosis and treatment.

¶ 84     The SANE then testified that L.C. told her that the assailant "hit [L.C.'s] arm and told her to call the police, and said that he wasn't leaving until she called police." Then he took away L.C.'s cellphones and went looking for something in the house. He said he "couldn't find a wire hanger, so that's when he took his belt off and hit her in the back with his belt and then made her get on her knees and put his penis in her mouth and then had her get on the bed and had sex with her, and then there was another time he had sex with her." The SANE also said that "at one point in the morning, he told [L.C.] that if they don't get an understanding this will happen again."

¶ 85     On appeal, Abdulla challenges the admissibility of L.C.'s statements to the SANE (1) indicating that it was Abdulla who

assaulted her; (2) describing how Abdulla assaulted her; and (3) alleging that Abdulla made threats during the assault.[2]

¶ 86 As an initial matter, the record belies Abdulla's contention that the trial court erred by allowing the SANE to testify that L.C. "indicat[ed] it was Mr. Abdulla who assaulted her." The SANE did not identify Abdulla by name at any point during her testimony, and, even if she had, identity was not an issue in this case.

¶ 87 Given that one purpose of the SANE's examination was to provide medical care or treatment to L.C., the trial court did not abuse its discretion by admitting *most* of the SANE's testimony regarding what L.C. told her about the sexual assault, including L.C.'s "statements as to how [Abdulla] allegedly assaulted her." *See* CRE 803(4).

¶ 88 But we agree with Abdulla that not *all* of the testimony fit the exception. The statements regarding (1) L.C.'s phones being taken away; (2) Abdulla looking for a wire hanger; and (3) the threat that

---

[2] We note that, after the trial court overruled defense counsel's initial objection and ruled that the SANE's testimony fell under the medical diagnosis exception to the hearsay rule, defense counsel did not renew the objection when the SANE relayed statements that would fall outside that exception. But the People do not challenge preservation of this issue, so we analyze it as if it were preserved.

"if they don't get an understanding this will happen again" likely fall

outside the exception. *See People v. Jaramillo,* 183 P.3d 665, 669

(Colo. App. 2008) (concluding that the victim's statements to a

nurse practitioner were inadmissible hearsay because the

challenged statements were not necessary for or pertinent to the

nurse practitioner's diagnosis or treatment).

¶ 89　　But even if the trial court abused its discretion by admitting

these statements, for the reasons set forth in the following section,

we conclude that any error was harmless.

### 5.　　Any Error Admitting Hearsay Was Harmless

¶ 90　　Even if the trial court erred by admitting L.C.'s statements to

the detective, to her sister, and to the SANE under exceptions to the

hearsay rule, we conclude that the error was harmless and reversal

is not required. *Hagos,* ¶ 12; *People v. Gaffney,* 769 P.2d 1081,

1088 (Colo. 1989) ("If a reviewing court can say with fair assurance

that, in light of the entire record of the trial, the error did not

substantially influence the verdict or impair the fairness of the trial,

the error may properly be deemed harmless.").

¶ 91　　Abdulla admitted to a physical altercation and did not dispute

that the sexual acts occurred; his defense was that L.C. had

41

consented. Indeed, the defense theory instruction stated, "[L.C.] and her husband, Sharif Abdulla, had a verbal argument about him being out all night on Friday. The fight became physical and thereafter, [L.C.] consented to all sexual acts with Mr. Abdulla." Thus, any hearsay statements about the physical acts were largely cumulative and related to uncontested facts. *See People in Interest of R.D.H.*, 944 P.2d 660, 664 (Colo. App. 1997) (determining that any error in allowing a social worker to testify as to mother's history of drug use was harmless because the challenged evidence was cumulative); *see also Jaramillo*, 183 P.3d at 669 (noting the improperly admitted hearsay statements were related to uncontested facts and concluding any error in the admission of the challenged statements was harmless).

¶ 92     To the extent that the hearsay statements related to the contested issue of consent, they appear not to have had an impact on the jury. *People v. Harris*, 43 P.3d 221, 231 (Colo. 2002) (considering, among other things, whether the impact the erroneously admitted hearsay evidence had on the jury was significant). At trial, L.C. admitted that she did not indicate to Abdulla that any of the sexual acts were nonconsensual; rather, she

42

said she was too scared to tell him no. The jury was able to judge L.C.'s credibility for itself. By acquitting Abdulla of sexual assault, it appears the jury did not believe L.C. that the sex was nonconsensual or that she communicated her lack of consent to Abdulla.

¶ 93 To the extent that the hearsay statements related to the contested issue of exactly how Abdulla assaulted L.C., the prosecution offered strong, corroborating evidence, including L.C.'s own testimony at trial, pictures of L.C.'s injuries, and the SANE's testimony that L.C.'s injuries were consistent with what L.C. reported to her. *Blecha v. People*, 962 P.2d 931, 944 (Colo. 1998) (determining that any error in the improperly admitted hearsay statements was harmless because there was "persuasive corroborative evidence").

¶ 94 In addition, had the improperly admitted statements been offered after L.C. testified, they may have been admitted as prior consistent statements. *See* CRE 801(d)(1)(B). The trial court even alluded to this when overruling Abdulla's objection to the detective's testimony when it said, "In addition, I don't know this, I haven't heard from the alleged victim, [but it] might be a prior consistent or

inconsistent statement." L.C. did testify and, on cross-examination, defense counsel attacked her credibility, impeached her with prior inconsistent statements, and suggested she had an ulterior motive for making allegations against her husband. *See People v. Eppens*, 979 P.2d 14, 21-22 (Colo. 1999).

¶ 95 Abdulla argues the acquittal on the sexual assault charge demonstrates that "this was a very close case," thus increasing the likelihood that "[a]dmission of the improperly admitted hearsay statements . . . may have tipped the balance in favor of a jury determination that, although he had not committed the sexual assault, Mr. Abdulla had been abusive and should be found guilty of some sort of sexual misconduct." We disagree. If the jury was improperly influenced, it would have been more likely to have convicted of the greater offense. Instead, its verdict demonstrates it was not improperly swayed by what L.C. said to the detective, her sister, or the SANE; rather, it was thoughtful and deliberate in its decision.

¶ 96 Ultimately, we conclude that any erroneous admission of hearsay statements was harmless as it did not substantially

influence the verdict or affect the fairness of the trial proceedings.

*Yusem v. People,* 210 P.3d 458, 469 (Colo. 2009).

### III.    Conclusion

¶ 97    The judgment of conviction is affirmed.

JUDGE J. JONES and JUDGE HARRIS concur.